1  Jeffrey D. Kaliel (CA Bar No. 238293)
   jkaliel@kalielpllc.com
2  Sophia Goren Gold (CA Bar No. 307971)
   sgold@kalielpllc.com
3  KALIEL PLLC
4  1875 Connecticut Ave., NW, 10th Floor
   Washington, D.C.  20009
5  (202) 350-4783

6

7  Attorneys for Plaintiffs Petra Lopez, Colea Wright, Suzanne Pidcock,
   and the Putative Class

8

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

9

10

11  PETRA LOPEZ, COLEA WRIGHT,      Case No. 2:18-cv-00031
    and SUZANNE PIDCOCK, on behalf of
12  themselves and all others similarly
    situated,                       **SECOND AMENDED**
13                                  **CLASS ACTION COMPLAINT**
                    Plaintiffs,
14
15          v.

16  COMPASS BANK dba BBVA
    COMPASS,
17
                    Defendant.
18

19

20

21

22

23

24

25

26

27

28

1  Plaintiffs PETRA LOPEZ, COLEA WRIGHT, and SUZANNE PIDCOCK, on

2  behalf of themselves and all others similarly situated, sue Defendant COMPASS

3  BANK dba BBVA COMPASS ("BBVA BANK") and allege:

### INTRODUCTION

4

5  1)    Plaintiffs seek redress for three distinct unlawful practices that BBVA

6  BANK perpetrates on its checking customers.  Plaintiffs assert this action pursuant to

7  Fed. R. Civ. P. 23, on behalf of themselves and all others similarly situated

8  throughout the United States, for damages and other relief arising from BBVA

9  BANK's routine practice of a) assessing overdraft fees on transactions that did not

10  overdraw checking account available balances; b) failing to disclose that out-of-

11  network ATM withdrawals will incur two separate fees, which costs consumers a

12  total of between $5 and $7 for a single ATM withdrawal; and c) assessing multiple

13  insufficient funds fees ("NSF Fees") on the same transaction.

14  2)    Besides being deceptive, unfair and unconscionable, the first and third

15  practices breach promises made in BBVA BANK's contracts; and the second practice

16  deceives consumers in violation of California consumer protection law.

17  3)    **First**, at the moment debit card transactions are authorized on an account

18  with positive funds to cover the transaction, BBVA BANK immediately decrements

19  consumers' checking accounts for the amount of the purchase and holds funds in a

20  checking account to cover that specific transaction.  As a result, and with limited

21  exceptions, customers' accounts *always* have sufficient available funds to cover these

22  transactions throughout their entire life-cycle.

23  4)    However, BBVA BANK still assesses crippling $32 OD Fees on many

24  of these transactions, in violation of its contractual promises not to do so.

25  5)    Despite putting aside sufficient available funds for debit card

26  transactions, BBVA BANK charges OD Fees on those same transactions if they

27  purportedly settle—days later—into a negative balance ("Authorize Positive,

28  Purportedly Settle Negative Transactions" or "APPSN Transactions").

6)      Here is how it works.  BBVA BANK maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made.  When a customer makes a purchase with a debit card, BBVA BANK sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

7)      Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

8)      That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions.  This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

9)      Still, despite promising to keep those held funds off-limits for other transactions, BBVA BANK invades held funds and improperly charges OD Fees on

1   APPSN Transactions—the latter of which should always have sufficient available

2   funds for payment.

3          10)   Indeed, the Consumer Financial Protection Bureau ("CFPB") has

4   expressed concern with this very issue, flatly calling the practice "deceptive" when:

> a financial institution authorized an electronic transaction,
> which reduced a customer's available balance but did not result
> in an overdraft at the time of authorization; settlement of a
> subsequent unrelated transaction that further lowered the
> customer's available balance and pushed the account into
> overdraft status; and when the original electronic transaction
> was later presented for settlement, because of the intervening
> transaction and overdraft fee, the electronic transaction also
> posted as an overdraft and an additional overdraft fee was
> charged. Because such fees caused harm to consumers, one or
> more supervised entities were found to have acted unfairly
> when they charged fees in the manner described above.
> Consumers likely had no reason to anticipate this practice,
> which was not appropriately disclosed. They therefore could
> not reasonably avoid incurring the overdraft fees charged.
> Consistent with the deception findings summarized above,
> examiners found that the failure to properly disclose the
> practice of charging overdraft fees in these circumstances was
> deceptive. At one or more institutions, examiners found
> deceptive practices relating to the disclosure of overdraft
> processing logic for electronic transactions. Examiners noted
> that these disclosures created a misimpression that the
> institutions would not charge an overdraft fee with respect to an
> electronic transaction if the authorization of the transaction did
> not push the customer's available balance into overdraft status.
> But the institutions assessed overdraft fees for electronic
> transactions in a manner inconsistent with the overall net
> impression created by the disclosures. Examiners therefore
> concluded that the disclosures were misleading or likely to
> mislead, and because such misimpressions could be material to
> a reasonable consumer's decision-making and actions,
> examiners found the practice to be deceptive. Furthermore,
> because consumers were substantially injured or likely to be so
> injured by overdraft fees assessed contrary to the overall net
> impression created by the disclosures (in a manner not
> outweighed by countervailing benefits to consumers or

4

competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015, "Supervisory Highlights."

11)     There is no justification for these practices, other than to maximize BBVA BANK's OD Fee revenue.  APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance by invading previously held funds.  But BBVA BANK is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.  But BBVA BANK was not content with these millions in OD Fees.  Instead, it sought millions *more* in OD Fees on APPSN Transactions.

12)     In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that the BBVA BANK immediately deducts funds, or places a hold on funds, at the very moment debit card transactions are initiated, and will <u>only</u> charge OD Fees on transactions with insufficient available funds to pay a given transaction:

> **Available Balance**. The balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance reflects any holds placed on your account, including the restrictions described in the Funds Availability Disclosure included with this Agreement.
> […]
> **Insufficient Available Balance and Overdrafts**. If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, return any of the items unpaid or pay any or all of the items, even though payment will cause an overdraft of your account.  We may return any item at any time if your available balance is insufficient to pay that item, even if we previously have permitted overdrafts…You agree that, if your available balance is insufficient to pay any item presented against your account, you will pay promptly both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand.

5

[…]
You may withdraw part or all of your account's available balance. Any account owner or authorized signer of a joint account or any agent of any owner may withdraw all or part of the available balance in the account, regardless of who deposited the funds into the account.

[…]

**If an item was initiated at a point-of-sale terminal or is a VISA transaction or ATM transaction, you agree that we may charge the amount of the item to your account or place a hold on your account in the amount requested by the merchant immediately upon authorization of such transaction, even though we have not then actually received the item for payment**. We will make payment for a transaction only after the actual transaction is presented to us physically or electronically. Each such hold will reduce the available balance in your account by the amount of the hold.

Exhibit 1, BBVA BANK's "Consumer Deposit Account Agreement" (emphasis added).

13)     For APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to pay those transactions—yet BBVA BANK assesses OD Fees on them anyway.

14)     In short, BBVA BANK is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

15)     **<u>Second</u>**, and as alleged below, when accountholders use a non-bank ATM, the fees add up very quickly—to the surprise of consumers.

16)     Not only does a non-bank ATM operator charge the consumer a fee for use of its ATM, a charge which now averages $3, but BBVA does as well—a punishing double-fee that can rise to a total 6 or 7 dollars for a consumer to simply access her own money.  BBVA never adequately informs consumers they will be

charged two separate fees for each non-bank ATM withdrawal, and never once tells consumers the total amount of that double-fee.

17)    To the contrary, BBVA prominently touts in marketing materials for certain of its checking accounts that there are **"No BBVA Compass fee for ATM Withdrawals."**

18)    **Third**, and as alleged in detail below, BBVA charges a $32 NSF Fee when it rejects payment on a given checking account transaction.  However, it violates its contract when it charges another NSF Fee when it attempts to process the *same transaction* it earlier rejected.

19)    Plaintiffs and other BBVA BANK customers have been injured by BBVA BANK's practices.  On behalf of themselves and the putative class, Plaintiffs seek damages and restitution for BBVA BANK's breach of contract and violations of federal and state statutes. Additionally, Plaintiffs seek an injunction on behalf of the general public to prevent BBVA BANK from continuing to engage in its illegal and deceptive practices.

## PARTIES

20)    Plaintiff, Petra Lopez, is a resident of the State of California and has used her checking account with BBVA BANK to conduct transactions in California, for all transactions relevant to this Complaint.

21)    Plaintiff, Colea Wright, is a resident of the State of California and has used her checking account with BBVA BANK to conduct transactions in California, for all transactions relevant to this Complaint.

22)    Plaintiff Wright moved to California in July 2016, when she undertook permanent residence in Apple Valley, California. Plaintiff Wright was domiciled in California for all transactions relevant to this Complaint.

23)    After moving to California, Plaintiff Wright called BBVA to a) inform the Bank she moved to California; and b) to ask whether a BBVA branch existed close to her new home in California.

1    24)    Plaintiff, Suzanne Pidcock, is a resident of the State of California and

2    has used her checking checking account with BBVA BANK to conduct transactions

3    in California, for all transactions relevant to this Complaint.

4    25)    BBVA BANK is a bank with its U.S. headquarters and principal place of

5    business located in Birmingham, Alabama.  BBVA BANK operates numerous retail

6    banking centers nationwide and throughout California.  Among other things, BBVA

7    BANK is engaged in the business of providing retail banking services to consumers,

8    including Plaintiffs and members of the putative classes, which includes the issuance

9    of checks and debit cards for use by customers in conjunction with their checking

10   accounts.

11                        **JURISDICTION AND VENUE**

12   26)    This Court has original jurisdiction pursuant to the Class Action Fairness

13   Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original

14   jurisdiction because the aggregate claims of the putative class members exceed $5

15   million, exclusive of interest and costs, and at least one of the members of the

16   proposed classes is a citizen of a different state than BBVA BANK.

17   27)    BBVA BANK regularly and systematically conducts business and

18   provides retail banking services in this district, and provides retail banking services to

19   customers in California, including Plaintiffs and members of the putative class.

20   28)    Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391

21   because BBVA BANK is subject to personal jurisdiction in this Court and regularly

22   conducts business within this district, and because Plaintiff Lopez conducted the

23   relevant account transactions in this district.  Thus, a substantial part of the events

24   giving rise to the claims asserted herein occurred and continue to occur in this

25   district.

26                              **OVERVIEW**

27   **I.    BBVA IMPROPERLY CHARGES OD FEES ON TRANSACTIONS
     AUTHORIZED ON POSITIVE FUNDS**

28        **A.    Mechanics of a Debit Card Transaction**

29)     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from BBVA BANK. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to BBVA BANK, which verifies that the customer's account is valid and that sufficient available funds are sufficient to "cover" the transaction amount.   Therefore, the debit card transaction is presented to BBVA immediately.

30)     At this step, if the transaction is approved, BBVA BANK immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

31)     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

32)     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

33)     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized occurs.  That is because available funds amounts do not change

1    for debit card transactions that settle in the same amount for which they were

2    authorized.

3        **B.**    **BBVA BANK Account Documents**

4        34)    Plaintiffs' checking accounts with BBVA BANK were, at all relevant

5    times, governed by BBVA BANK's standardized Consumer Deposit Account

6    Agreement ("Deposit Agreement") for deposit accounts, the material terms of which

7    are drafted by BBVA BANK, amended by BBVA BANK from time to time at its

8    convenience and complete discretion, and imposed by BBVA BANK on all of its

9    customers.

10        35)    Plaintiffs were provided the Deposit Agreement, along with a Fee

11    Schedule and a form to opt-in or opt-out of overdraft protection ("Opt-in Form") at

12    the time they opened their accounts with BBVA.  Plaintiffs were provided no other

13    contract documents at the time they opened their checking accounts with BBVA, and

14    gave their assent to no other contract documents regarding their BBVA checking

15    accounts.

16        36)    Indeed, the Deposit Agreement states plainly that no other documents

17    govern Plaintiffs' checking accounts:

18
19
20
21
22
23
24
25
26
> This Agreement covers any type of deposit account (as defined below) you may have with us now, or in the future, that is used primarily for personal, family or household purposes. By opening your account, by conducting any transaction involving your account, or by maintaining your account after receipt of this Agreement, you agree to the terms in this Agreement. This Agreement includes not only this document but also your signature card, the Consumer Products Terms and Conditions Booklet, your Relationship Summary Form and the Miscellaneous Fees and Charges Disclosure. This Agreement also includes any new or amended provisions and disclosures we may provide concerning your account. All of these documents together are a contract between you and us.

27
28

37)     Of the documents listed in the Deposit Agreement as comprising the contract for the checking account, Plaintiffs were provided only the Deposit Agreement and Miscellaneous Fees and Charges Disclosure ("Fee Schedule").

38)     In plain, clear, and simple language, the Deposit Agreement promises that the BBVA BANK will only charge OD Fees on transactions with insufficient available funds to pay a given transaction:

> **Available Balance**. The balance of funds in your account that is available for immediate withdrawal. Unlike the posted balance, the available balance **reflects any holds** placed on your account, including the restrictions described in the Funds Availability Disclosure included with this Agreement.
>
> […]
>
> **Insufficient Available Balance and Overdrafts**. If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, return any of the items unpaid or pay any or all of the items, even though payment will cause an overdraft of your account.  We may return any item at any time if your available balance is insufficient to pay that item, even if we previously have permitted overdrafts…You agree that, if your available balance is insufficient to pay any item presented against your account, you will pay promptly both our service charge for handling and processing that item and the amount of any overdraft without further notice or demand.
>
> […]
>
> You may withdraw part or all of your account's available balance. Any account owner or authorized signer of a joint account or any agent of any owner may withdraw all or part of the available balance in the account, regardless of who deposited the funds into the account.
>
> […]

> **If an item was initiated at a point-of-sale terminal or is a VISA transaction or ATM transaction, you agree that we may charge the amount of the item to your account or place a hold on your account in the amount requested by the merchant immediately upon authorization of such transaction, even though we have not then actually received the item for payment**. We will make payment for a transaction only after the actual transaction is presented to us physically or electronically. **Each such hold will reduce the available balance in your account by the amount of the hold.**

Exhibit 1, BBVA BANK's "Consumer Deposit Account Agreement" (emphasis added).

39)     The Opt-in Form fails to accurately describe BBVA's overdraft fee policies, stating only that:

> An overdraft occurs when you do not have enough money in your account to cover a transactions, but the transaction is paid anyway.
>
> […]
>
> We do not authorize and pay overdrafts for the following types of transactions unless you ask us to….(i) ATM transactions; and (ii) everyday debit card transactions.
>
> […]
>
> If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions…complete the form below[.]

**C.      The Account Documents Fundamentally Misconstrue BBVA BANK's True Overdraft Fee and Debit Processing Practices**

40)     The Account Documents misconstrue the BBVA BANK's true debit card processing and OD Fee practices in at least two ways.

41)     First, and most fundamentally, the BBVA BANK charges OD Fees on debit card transactions for which there are sufficient available funds to pay the transactions.   That is despite contractual representations that the BBVA BANK will only charge OD Fees on transactions with insufficient available funds to pay a given

1  transaction and that the bank will immediately deduct or place a hold on funds for

2  such transactions.

3      42)   BBVA BANK assesses OD Fees on APPSN Transactions that **_do_** have

4  sufficient available funds to pay them throughout their lifecycle.

5      43)   Those available funds are sequestered at the moment a debit card

6  transaction is approved by BBVA BANK.

7      44)   BBVA BANK's practice of charging OD Fees even where sufficient

8  available funds exist to pay a transaction violates a contractual promise not to do so.

9  This discrepancy between BBVA BANK's actual practice and the contract causes

10  consumers like Plaintiffs to incur more OD Fees than they should.

11      45)   Sufficient funds for APPSN Transactions actually are debited from the

12  account immediately, consistent with standard industry practice.

13      46)   Because these withdrawals take place upon initiation, they cannot be re-

14  debited later.  But that is what BBVA BANK does when it re-debits the account

15  during a secret batch posting process.

16      47)   In reality, BBVA BANK's actual practice is to assay the same debit card

17  transaction twice to determine if the transaction overdraws an account—both at the

18  time a transaction is authorized and at the time of settlement.

19      48)   At the time of settlement, however, an available balance *does not change*

20  *at all* for these transactions previously authorized into good funds.  As such, BBVA

21  BANK cannot then charge an OD Fee on such a transaction because the available

22  balance has not been rendered insufficient due to the pseudo-event of settlement.

23      49)   Upon information and belief, something more is going on:  at the

24  moment a debit card transaction is getting ready to settle, BBVA BANK does

25  something new and unexpected, during the middle of the night, during its nightly

26  batch posting process.  Specifically, BBVA BANK releases the hold it had placed on

27  funds for the transaction for a split second, putting money back into the account, then

28  re-debits the same transaction a second time.

50)     This secret step allows it to charge overdraft fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which BBVA BANK specifically set aside money to pay them.

51)     This discrepancy between BBVA BANK's actual practices and the contract causes consumers to incur more OD Fees than they should.

52)     <u>Second</u>, the bank promises to make overdraft determinations only at the time is elects whether or not to pay an overdraft: "If your available balance is insufficient to pay the total amount of items presented against your account, **we may, at our option, return any of the items unpaid or pay any or all of the items**, even though payment will cause an overdraft of your account" (emphasis added).

53)     But for debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  According to the "must-pay" network rule, once BBVA authorizes a debit card transaction, it has no choice but to pay it.  It cannot change its mind later.

54)     Third, BBVA BANK never states in the Deposit Agreement that it will invade debit holds immediately placed for debit card transactions.

55)     In short, BBVA BANK promises that it will make overdraft fee determinations at the time of authorization.  That means that APPSN Transactions rightly cannot incur overdraft fees.

56)     In sum, there is a yawning gap between BBVA BANK's practices as described in the account documents and BBVA BANK's practices in reality.

**D.      Reasonable Consumers Understand Debit Card Transactions are Debited, or Funds are Held, Immediately**

57)     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal/hold of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

58) BBVA BANK was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

59) BBVA BANK well knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

60) Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear."[1]

61) Further, Consumer Action informs consumers that, "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

62) This is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[2]

63) Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit cards purchase is the functional equivalent to a

---

[1] *See* http://www.consumeraction.org/helpdesk/articles/what
_do_i_need_to_know_about_using_a_debit_card (last visited June 8, 2016).

[2] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

1  cash purchase, with the swipe of a card equating to handing over cash, permanently

2  and irreversibly.

3      64)    BBVA BANK was aware of a consumer perception that debit

4  transactions reduce an available balance *in a specified order*—namely, the order the

5  transactions are actually initiated—and its account agreement only supports this

6  perception.

7      **E.    Plaintiff Wright's Overdraft Fee Experience**

8      65)    On November 1, 2016 Plaintiff Wright was assessed five OD Fees in the

9  amount of $38.00 each for eight transactions—all of which took place in California,

10 while she resided in California—that settled on October 31, five (5) of which were

11 debit card transactions that were initiated on or prior to October 30.  Plaintiff Wright

12 was charged five OD fees despite the fact that positive funds were deducted

13 immediately for at least five (5) of the debit card transactions on which she was

14 assessed OD Fees.

15     66)    Indeed, the only reason six of the debit card transactions that settled on

16 October 31 incurred overdraft fees was because of a $140 ATM withdrawal that

17 Plaintiff Wright made *after* those six debit card transactions had already been

18 initiated.

19     67)    Plaintiff does not dispute that BBVA BANK was within its rights to

20 charge an OD Fee on the ATM transaction, because it was authorized into insufficient

21 funds.  Plaintiff Wright disputes, however, that BBVA BANK was authorized to

22 charge OD Fees on the prior in time debit card transactions initiated on sufficient

23 funds.

24     68)    BBVA BANK assessed OD Fees on the held transactions even though it

25 had sequestered available funds for those transactions at the time they were

26 authorized.

27

28

CLASS ACTION COMPLAINT

69)     Plaintiff Wright was promised, at account opening, that funds would be deducted and held immediately for debit card transactions, and that held funds would not be invaded by the Bank for other purposes.

70)     However, the Bank did in fact invade held funds.

71)     Plaintiff Wright would not have signed up for a BBVA account, or would not have used her BBVA debit card for the purchases specified above, if she had known that BBVA would not actually hold funds immediately for debit card transactions.

## II.     BBVA's MARKETING MATERIALS MISREPRESENT ITS POLICIES WITH RESPECT TO THE ASSESSMENT OF FEES FOR OUT OF NETWORK ATMS

72)     ATM Fee revenue has risen dramatically in recent years and become one of the primary drivers of Bank fee income.

73)     Many Banks, including BBVA, offer fee-free ATM withdrawals at ATMs owned by the Bank or its partners.

74)     However, when accountholders use a non-bank ATM, the fees add up very quickly—to the surprise of consumers.

75)     Not only does a non-bank ATM operator charge the consumer a fee for use of its ATM, a charge which now averages $3, but BBVA does as well—a punishing double-fee that can rise to a total 6 or 7 dollars for a consumer to simply access her own money.  BBVA's Deposit Agreement and Fee Schedule never adequately informs consumers they will be charged two separate fees for each non-bank ATM withdrawal, and never once tells consumers the total amount of that double-fee.

76)     To the contrary, BBVA's marketing materials deceive reasonable consumers into believing that they will not be charged ATM Fees for out of network ATM use.

77)     When Plaintiff Lopez signed up for her BBVA checking account in a California BBVA branch, she was provided marketing materials that stated:

BBVA Compass NBA Checking

Get in the game with a BBVA Compass NBA Checking account that includes:

- No monthly service charge
- Complimentary Online Banking with Bill Pay and Online Statements
- Complimentary Mobile Banking with Bill Pay
- No BBVA Compass fee for ATM Withdrawals
- Complimentary check card you can customize with your favorite NBA team logo

78)    BBVA's marketing materials did nothing to place consumers on notice of the large double-fee for a simple ATM withdrawal.

79)    Plaintiff was also provided with a Fee Schedule at the time of account opening that, similarly, stated she would not be subject to any fees for ATM usage from BBVA, regardless of the owner of the ATM used.

80)    Plaintiff Lopez was deceived by BBVA's marketing representations. She was not adequately informed that she would be charged two fees for each ATM withdrawal out of network, and she would not have opened her account with BBVA and/or would not have made these withdrawals from out of network ATMs if she had known the truth.

81)    Indeed, a motivating force for Plaintiff Lopez in signing up for the NBA account was precisely the promise that she would not be subject to double-fees for ATM withdrawals.  But that promise turned out to be false.

82)    For example, on two occasions on June 7, 2016, Plaintiff Lopez paid both a $2.50 fee to BBVA and a $4 fee to the ATM owner—for a total of $6.50—to withdraw $100 from an out-of-network ATM.  Before her withdrawal was complete, she was never informed of this total double-fee by BBVA or by the ATM owner.

83)    On August 15, 2016, Plaintiff Lopez paid a $2.50 and a $3 fee to the ATM owner—for a total of $5.50—to withdraw $80. Before her withdrawal was

complete, she was never informed of this total double-fee by BBVA or by the ATM owner.

84)   And on August 29, 2016, Plaintiff Lopez paid a $2.50 and a $2 fee to the ATM owner—for a total of $4.50—to withdraw just $40. Before her withdrawal was complete, she was never informed of this total double-fee by BBVA or by the ATM owner.

## III.   BBVA IMPROPERLY CHARGES MORE THAN ONE NSF FEE ON THE SAME TRANSACTION

### A.   Plaintiff Pidcock's Experience

85)   On August 17, 2016 Ms. Pidcock attempted to make online bill payments of $300 and $15 to the predatory online payday lender "Speedy Cash" through her BBVA BANK checking account. Because this was the second time each of these identical payments had been attempted on her account—the first attempt having been unsuccessful—BBVA labelled the transactions "RETRY PAYMENTS" on Plaintiff's bank statement. Ms. Pidcock had insufficient funds in her account on August 17, 2016, and BBVA BANK rejected those payment requests and again charged Ms. Pidcock, a $32 NSF Fee each for doing so. Those very same transactions had been processed a few days prior by BBVA BANK, when BBVA BANK also rejected the same transaction and charged Plaintiff two $32 NSF Fees for doing so. In sum, *BBVA BANK charged Plaintiff a staggering $128 in fees to reject the same payments twice.*

86)   Ms. Pidcock took no affirmative action to reinitiate or resubmit the transactions.

87)   Plaintiff understood the bill payments to be a single transaction, capable at most of receiving a single NSF Fee. BBVA BANK itself also understood each of the transactions to be single transaction, and its systems categorized them as such. Indeed, on Ms. Pidcock's bank statements, BBVA BANK described subsequent attempts to debit the transaction as "RETRY PAYMENTS."

88)     BBVA BANK can easily code transactions it considers "overdrawn" to not incur OD/NSF Fees.

89)     Upon information and belief, BBVA BANK's systems are programmed to recognize a single transaction featuring the same dollar amount and merchant when that single transaction is submitted for payment multiple times.

**B.     Relevant Deposit Agreement and Online Banking Agreement Provisions**

90)     The Deposit Agreement promises that only one NSF Fee will be charged per transaction.

91)     According to the Deposit Agreement:

Item. A check, substitute check, draft, withdrawal order, payment order, or other similar instrument, order or instruction, whether oral, written or electronic, either for the deposit of funds to your account or for the payment of funds from your account. Items include debits and credits for point-of-sale, ATM, and Check Card transactions.

[…]

Insufficient Available Balance and Overdrafts. If your available balance is insufficient to pay the total amount of items presented against your account, we may, at our option, **return any of the items unpaid or pay any or all of the items**, even though payment will cause an overdraft of your account.

(emphasis added).

92)     The Fee Schedule states:

Insufficient Funds (NSF) Charge - Paid Item        $32 per item
Insufficient Funds (NSF) Charge - Returned Item  $32 **per item**
(emphasis added).

93)     The Agreement and Disclosure Statement for Online Banking states:

**"Entry" means an ACH credit entry file** (including any batches contained within a file) which is submitted to us for processing under your subscription to Online Banking.

Insufficient Collected Funds. **If you do not have sufficient Collected Funds in the ACH Account for any Entry, we have no obligation to process or to transmit that Entry, and may suspend processing of that Entry.** If you have submitted more than one Entry, we may process and transmit only those Entries for which you have Collected Funds. If we receive an Entry for which there are insufficient Collected Funds in the ACH Account, we may attempt to notify you, but you agree that we shall have no liability to you for failure to notify you regarding the insufficiency of Collected Funds. We will maintain the suspended Entry in our ACH system until the Requested Settlement Date, checking at each Entry Window to see if sufficient Collected Funds have become available in the ACH Account for that Entry. **If sufficient Collected Funds are not available in the ACH Account for the suspended Entry by 9 PM Central Time on the Requested Settlement Date, that Entry automatically will be deleted from our ACH system.**

You acknowledge and agree that, if you submit an Entry for which there are insufficient Collected Funds in the ACH Account at the time of submission, then

- **The Entry may be deleted from our ACH system and never settle with its intended Recipient, or**
- Even if Collected Funds should become available in the ACH Account at a later time, the Entry may not settle with its intended Recipient until a date after the Requested Settlement Date.

[…]

**Insufficient Funds in a Payment Account.** You agree to submit Payment Instructions for a bill payment only when there are or will be sufficient funds in the Payment Account to cover both that payment and any other items or charges to be paid from the Payment Account.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**If there are insufficient funds in the Payment Account to cover any Scheduled Payment, the Bill Pay Service may either (i) make the Scheduled Payment, even if it overdraws the Payment Account or (ii) decline to make the Scheduled Payment.** In either event, you are responsible for any non-sufficient funds or overdraft charges authorized in the Account Agreement for the Payment Account. **The Bank has no obligation to inform you if the Bill Pay Service declines to make a Scheduled Payment because there are insufficient funds in the Payment Account. In this situation, you are responsible for rescheduling the payment through the Bill Pay Service or making alternate arrangements.** You agree that, if the Bill Pay Service is used to make a Scheduled Payment that overdraws the Payment Account:

- You will reimburse the Bank or its Service Provider, as applicable, immediately upon demand for any funds advanced on your behalf;

- For any amount not reimbursed within fifteen (15) days after initial demand, the Bank or its Service Provider, as applicable, may require you to pay a late charge equal to 1.5% of the amount advanced. This late charge is in addition to any non-sufficient funds or overdraft charges imposed under the Account Agreement for the Payment Account;

- You will reimburse us for any fees incurred in attempting to collect the amount of the advanced funds and any late charge from you; and,

The Bank may report the facts concerning the overdrawn account to any credit reporting agency.

(emphases added).

C.   <u>BBVA May Not Charge More than One NSF Fee on a Single Item</u>

94)   Consistent with express representations in the contract, reasonable consumers understand any given instruction for payment to be one, singular transaction and one "item" as that term is used in BBVA BANK's contract documents.

95)     As discussed herein, the Bank has this same understanding in practice, since its systems code transactions in a way that alerts the Bank when the same item or transaction is being re-submitted for payment.

96)     The contract documents bar BBVA BANK from assessing multiple NSF Fees on the same item or transaction.

97)     "Item" is defined in the Deposit Agreement as one or multiple iterations of the same payment attempt.

98)     The Fee Schedule reiterates this reasonable meaning of "item."

99)     Both the Deposit Agreement and Online Banking Agreement state that a given transaction can be paid or declined, but not both.

100)   The Online Banking Agreement states that in event of insufficient funds, an item will be "deleted"—not re-processed.

101)   Indeed, BBVA states that if a payment is declined, it will be up to the accountholder to make alternative payment arrangement.  This is a clear statement that re-processing will not occur.

102)   The Online Banking Agreement promises two distinct paths for a payment attempted on insufficient funds:  either it will pay/reject and charge a fee or it will "delete" a payment.

103)   In sum, the Deposit Agreement, Fee Schedule, and Online Banking Agreement provide BBVA BANK the authority to charge only one NSF Fee per "item."  The terms of those agreements are starkly binary:  for a given transaction, the Bank may pay or return it, but it cannot do both for the same transaction, and it cannot do the same thing more than once.

104)   To the extent the account documents do not explicitly bar the polices described above, BBVA BANK exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies.

105)   First, the Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations.

1  BBVA BANK uses its contractual discretion to set the meaning of that term to choose

2  a meaning that directly causes more NSF Fees.

3      106)  <u>Second,</u> the Bank maintains a huge amount of discretion not to charge or

4  "deduct" NSF Fees on given transactions.  By charging more than one NSF Fee on a

5  given transaction, BBVA BANK engages in bad faith and contradicts reasonable

6  consumer expectations.

7  **CLASS ALLEGATIONS**

8      107)  Plaintiffs bring this action on behalf of themselves and all others

9  similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This

10  action satisfies the numerosity, commonality, typicality, adequacy, predominance and

11  superiority requirements of Rule 23.  The proposed classes are defined as:

> All BBVA BANK checking account holders who, within the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "APPSN Class").

> All BBVA BANK checking account holders who, within the applicable statute of limitations, were charged out of network ATM fees (the "Out of Network ATM Withdrawal Class").

> All holders of a BBVA BANK checking and/or money market account holders who, within the applicable statute of limitations, incurred more than one NSF Fee on the same transaction (the "Multiple NSF Fee Class").

In addition, the proposed California subclasses are defined as follows:

> All BBVA BANK checking account holders in the State of California who, within the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "California APPSN Class").

> All BBVA BANK checking account holders in the state of California who, within the applicable statute of limitations, were charged out of network ATM fees (the "California Out of Network ATM Withdrawal Class").

> All holders of a BBVA BANK checking and/or money market account holders in the state of California who, within the applicable statute of limitations, incurred more than one NSF Fee on the same transaction (the "California Multiple NSF Fee Class").

The three California classes are collectively referred to as the "California Subclasses." All of the classes are collectively referred to as the "Classes."

108)   Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.  Excluded from the class are BBVA BANK, its subsidiaries and affiliates, its officers, directors and member of their immediate families and any entity in which defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

109)   Plaintiffs reserve the right to modify or amend the definition of the proposed Classes if necessary before this Court determines whether certification is appropriate.

110)   This case is properly brought as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

111)   *Numerosity under Fed. R. Civ. P. 23(a)(1)*.  The members of the Class are so numerous that separate joinder of each member is impracticable.  Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to BBVA BANK's records.  BBVA BANK has the administrative capability through its computer systems and other records to identify all members of the Class and the amount of fees paid by each Class member, and such specific information is not otherwise available to Plaintiffs.

112)   *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to BBVA BANK's business

practices challenged herein, and those common questions predominate over any questions affecting only individual Class members.  The common questions include, but are not limited to:

a)  Whether BBVA BANK improperly charged overdraft fees on APPSN Transactions;

b)  Whether BBVA BANK failed to disclose there would be two fees for every out of network ATM transaction;

c)  Whether BBVA BANK improperly charges more than one NSF Fee for the same item; and

d)  The proper measure of damages.

113)  *Typicality under Fed. R. Civ. P. 23(a)(3)*.  Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practices by BBVA BANK, as described herein.

114)  *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4)*.  Plaintiffs are adequate representatives of the Class in that they have BBVA BANK checking accounts and have suffered damages as a result of BBVA BANK's assessment and collection of overdraft, ATM, and NSF fees.  In addition:

a)  Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)  There is no hostility of interest between Plaintiffs and the unnamed Class members;

c)  They anticipate no difficulty in the management of this litigation as a class action; and

d)  Plaintiffs' legal counsel have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

115)   *Predominance under Fed. R. Civ. P. 23(b)(3)*. The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues.  As such, the "commonality" allegations are restated and incorporated herein by reference.

116)   *Superiority under Fed. R. Civ. P. 23(b)(3).*  A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of BBVA BANK are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and BBVA BANK's misconduct will proceed without remedy.  In addition, even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

117)   All conditions precedent to bringing this action have been satisfied and/or waived.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**
**(On Behalf of the Classes and California Subclasses)**

118)   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

119)   Plaintiffs and BBVA BANK have contracted for bank account deposit, checking, ATM, and debit card services.

120)   BBVA BANK misconstrued in the account documents its true debit card processing and OD Fee practices and breached the express terms of the account documents.

121)   BBVA's Deposit Agreement and Fee Schedule did not inform consumers they will be charged two fees for each out of network ATM withdrawal.

122)   Moreover, no contract provision authorizes BBVA BANK to charge OD Fees on APPSN Transactions. Rather, the contract only authorizes BBVA Bank to charge OD Fees on transactions for which sufficient funds did not exist at the time of authorization.

123)   In addition, the Deposit Agreement bars BBVA BANK from charging more than one NSF Fee on the same item.

124)   Therefore, BBVA BANK breached the terms of its account documents by a) charging OD Fees on transactions that were authorized into a sufficient available balance, but whose available balances were allegedly insufficient at the time the transactions were settled; b) charging fees for out of network ATM withdrawals; and c) charging more than one NSF Fee on the same item.

125)   Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

126)   Plaintiffs and members of the Classes have sustained damages as a result of BBVA BANK's breach of the contract.

**SECOND CLAIM FOR RELIEF**
**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(On Behalf of the APPSN Class and APPSN California Subclass and the Multiple NSF Fee Class and Multiple NSF Fee California Subclass)**

127)   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

128)   Plaintiffs and BBVA BANK have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in contract documents.

129)   Under the law of California, good faith is an element of every contract pertaining to the assessment of OD Fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

130)   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

131)   BBVA BANK has breached the covenant of good faith and fair dealing in the contract through its overdraft policies and practices as alleged herein.

132)   Specifically, BBVA BANK harms consumers by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate.

133)   BBVA BANK uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

134)   BBVA BANK uses these contractual discretion points to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

135)   Moreover, BBVA abuses contractual discretion by repeatedly processing the same item, even though it knows such attempts will be futile, so that it may charge NSF Fees repeatedly.  BBVA also abuses contractual discretion to define the

term "item" in a way that allows it to charge multiple NSF Fees on the same transaction.

136)   Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.

137)   Plaintiffs and members of the Classes have sustained damages as a result of BBVA BANK's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF

**(Violation of California Unfair Competition Law
Business and Professions Code § 17200)
(On behalf of the California Subclasses)**

138)   Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

139)   Defendant's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq*.

140)   The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.   In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

141)   By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

142)   Defendant committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*., when it charged overdraft fees on APPSN transactions; failed to inform consumers that out of network ATM withdrawals will incur two separate fees; and assessed multiple insufficient funds fees on the same transaction.

143)   Defendant's conduct was not motivated by any business or economic need or rationale.   The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

144)   The harm to Plaintiffs and Class Members arising from Defendant's unfair practices outweighs the utility, if any, of those practices.

145)   Defendant's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

146)   Defendant's conduct was substantially injurious to consumers in that they have been forced to endure improper OD Fees, ATM withdrawal fees, and NSF fees.

147)   In addition, Defendant committed deceptive and fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it misrepresented its ATM withdrawal fees and failed to inform consumers that they would be charged two separate fees for out of network transactions. Such misrepresentations and omissions misled Plaintiff Lopez and are likely to mislead the public.

148)   As a result of Defendant's violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the members of the Classes demand a jury trial on all claims so triable and judgment against Defendant as follows:

A.   An order certifying that this action may be maintained as a class action, that Plaintiffs be appointed Class Representatives and Plaintiffs' counsel be appointed Class Counsel;

B.   Declaring that Defendant's policies and practices to be wrongful, unfair, and unconscionable;

CLASS ACTION COMPLAINT

1     C.     Ordering BBVA Bank to immediately cease the wrongful conduct set forth above and enjoining BBVA Bank from conducting business via the unlawful and unfair business acts and practices complained of herein;

D.     Restitution of all wrongful fees paid to BBVA Bank by Plaintiffs and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.     Actual and punitive damages in an amount to be determined at trial;

F.     Pre-judgment interest at the maximum rate permitted by applicable law;

G.     Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H.     Granting such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated:  May 25,  2018          Respectfully submitted,


               /s/ Jeffrey D. Kaliel
               Jeffrey D. Kaliel (CA Bar No. 238293)
               Sophia Goren Gold (CA Bar No. 307971)
               KALIEL PLLC
               1875 Connecticut Ave., NW, 10th Floor
               Washington, D.C.  20009
               (202) 350-4783
               *jkaliel@kalielpllc.com*
               *sgold@kalielpllc.com*

               Attorneys for Plaintiffs
               and the Putative Class